## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

*8:10cv 1482-T33 TBM*

JASON ATKINSON, DARIN OAKES,
WALTER SLAM, MICHAEL CORCORAN,
MATTHEW GUSTIN, KENDRA
DIMARIA and CHAD DIMARIA,

     **Plaintiffs,**

**vs.**                         **Case No.:**

ERIC K. SHINSEKI, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS,

     **Defendant.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF REQUESTED

     Plaintiffs, Jason Atkinson ("Atkinson"), Darin Oakes ("Oakes"), Walter Slam ("Slam"), Michael Corcoran ("Corcoran"), Matthew Gustin ("Gustin"), Kendra DiMaria ("DiMaria"), Chad DiMaria ("Chad DiMaria") and Timothy Torain ("Torain") complain of Defendant, Eric K. Shinseki, Secretary, Department Of Veterans Affairs, as follows:

### JURISDICTION

     1.     This court has jurisdiction of the claims in this complaint pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 28 U.S.C. § 1331.

     2.     Plaintiffs have complied with all jurisdictional prerequisites to action under Title VII of the Civil Rights Act of 1964 as amended including having exhausted or being excused of any required administrative remedies.

### PARTIES

     3.     Bay Pines VA Health Care System ("Bay Pines") is a Veterans Administration

("VA") hospital and medical center with related services.  It is directed by a Medical Center Director ("MCD"), currently Mr. Wallace Hopkins ("Hopkins").  Kristine Brown ("Brown") is presently and at relevant times was the Assistant Director at Bay Pines.  Bay Pines is broken down into various services.  Within the hospital, Dr. George Van Buskirk ("Van Buskirk") is the current Chief of Staff with line authority over the several medical services within the hospital, including the Medicine Service.  The chief of the Medicine Service is Dr. Lithium Lin ("Lin").

4.      Bay Pines has its own Police Service.  Robert Shogren ("Shogren") is presently and has been the chief of the Police Service since in or about February, 2008.   Shogren is supervised by Brown and ultimately Hopkins.  At relevant times, assistant chiefs of the Police Service included Lionel Barela ("Barela"), who was at relevant times and still is in charge of administration or operations, and Manuel Morales a/k/a Morales-Arroyo ("Morales"), who was at relevant times and still is in charge of patrol.   At relevant times Carl Lingenfelter ("Lingenfelter") and Robert Oneil ("Oneil") were Lieutenants in the Police Service; Corcoran, Atkinson, Slam, and Johnny Williams ("Williams") were supervisory sergeants and Ronald Kempienski ("Kempineski") and Theresa Torres ("Torres") were non-supervisory sergeants. The Police Service has three shifts or watches, including the A-Watch from 6 a.m. to 4 p.m.; the B-Watch from 2 p.m. to midnight; and the C-Watch from 10 p.m. to 8 a.m.

5.      As more fully set forth herein, the Plaintiffs are all former or present police officers with the Bay Pines Police Service.

6.      Each of the employees of the VA or Bay Pines described herein was employed by the Defendant or Bay Pines and was acting within the course and scope of his or her employment with the Defendant or Bay Pines at the time of the conduct described herein.

7.      The Plaintiffs' claims arise out of the same transaction or occurrence or series of

2

transactions or occurrences and the claims have common questions of fact and law.

## GENERAL ALLEGATIONS

### A.   Pattern, Practice and Culture of Retaliation

8.      The Defendant has engaged in a pattern and practice of retaliation and hostile retaliatory work environment and has maintained a culture of retaliation and hostile retaliatory work environment and has allowed a culture of retaliation and hostile retaliatory environment to be maintained with respect to Equal Employment Opportunity ("EEO") activity, including making EEO complaints, participating as a witness on behalf of other parties' EEO complaints and objecting to or opposing discriminatory and retaliatory conduct.

9.      For many years various high-ranking administrators, managers and supervisors at Bay Pines have punished employees or permitted or overlooked the hostile treatment of employees who made EEO complaints or who objected to or opposed discrimination or retaliation.   Such administrators have attempted to deter the making of EEO complaints by retaliating against or overlooking retaliation against employees who have made EEO complaints or have opposed discrimination or retaliation.   For example, Van Buskirk, the Chief of Staff, and Lin, the Chief of the Medicine Service, with the knowledge, assistance and support of Hopkins, decided to and attempted to deter the filing of employment complaints by retaliating against those who engaged in EEO activity.   To this end Lin and Van Buskirk, with the actual or tacit support of Hopkins, undertook a course of retaliation against numerous Bay Pines employees for engaging in EEO and other protected activity, including, *inter alia*, Dr. Diane Gowski, Dr. Claudia Cote, Dr. Sally Zachariah, Dr. Ramon Lopez, Dr. Jacques Durr, Dr. Robert Mandelkorn, Ms. Sabrina Patrick, Ms. Roxanne Lainhart Bronner, Dr. Selim Elzayat, Dr. Valpersia Gainers-Hasugluw, Ms. Pamela Trimle, Dr. Michel Vandermael and Dr. David Johnson.   Such retaliation

included, by way of example, various types of discipline and proposed discipline, including termination, suspension, reprimand and counseling; denying leadership positions; changing duties and office assignments; seeking information to discipline and terminate employees; seeking out employees to assist in gathering derogatory information about employees, including the solicitation of Reports of Conduct, which are written complaints by one employee against another and are used as a basis for steps in discipline; spying on employees; using unjust criticism and criteria and withholding awards until an employee agrees to provide information derogatory of other employees; rifling through employees' files and documents; creating and maintaining false records about employees; removing employees from committees; reducing or limiting physician's medical privileges and credentialing; subjecting physicians to inappropriate fitness-for-duty exams; failing to follow required procedural requirements for adverse or disciplinary actions; subjecting employees to lower evaluations, inappropriate bonuses and increasingly higher levels of discipline up to suspension without pay and termination; and using committees to insulate the administrators from appearing to have engaged in discriminatory or retaliatory conduct.

10.     As part of the pattern, practice and culture of retaliation and hostile retaliatory work environment, various administrators, managers and supervisors at Bay Pines have developed and maintained a reputation for retaliation against those who engage in EEO activity or do not join in their efforts to insulate their management style including their willingness to retaliate.

11.     As a result of the pattern, practice and culture of retaliation and hostile retaliatory work environment, a fear of retaliation has developed at Bay Pines. As a result, a number of very good employees are afraid to come forward with information they have concerning

discriminatory or retaliatory conduct and a number of very good employees have chosen to leave Bay Pines.

12.     As part of the pattern, practice and culture of retaliation and hostile retaliatory work environment, concerns about retaliation are ignored and not investigated.

A.     By way of example, an affidavit by Roxanne Lainhart Bronner, who was previously the Administrative Officer for Lin, was provided to various administrators at Bay Pines including Hopkins.  In that affidavit, Bronner pointed out the existence of a scheme, of which she had first hand knowledge, to retaliate against physicians for EEO activity in order to punish physicians for engaging in EEO activity and to deter future EEO activity by punishing, terminating and destroying the reputations and careers of such physicians.  The affidavit further pointed out that Hopkins' conduct assisted that scheme and that both he and Van Buskirk protected Lin.  Despite the affidavit, Hopkins did nothing to investigate the allegations in Bronner's affidavit.

B.     By way of further example, in August, 2007, a Bay Pines employee, Sabrina Patrick, advised the chief of staff (Van Buskirk) and Associate Director Kaye Green ("Green"), by email that she had filed an EEO complaint against Lin and his then acting Administrative Officer and that the acting Administrative Officer told her in the context of filing the EEO complaint that she (Ms. Patrick) would go nowhere at Bay Pines and that:

> "If I [the acting Administrative Officer] were you, I wouldn't file an EEO complaint.  Trust me you don't want to file.  If you file an EEO complaint, you're only going to make it harder for yourself.  I am protected by Dr. Lin and Dr. Van Buskirk; they told me they will protect me."

Ms. Patrick also advised Green and Van Buskirk that Lin's acting Administrative Officer also threatened a co-worker about an EEO complaint and mentioned to the co-worker that

an employee at the Gainesville VA had applied for a job at Bay Pines, but when Green found out she had filed an EEO complaint at the Gainesville VA, Green would not give him the job at Bay Pines. After Ms. Patrick provided this information by email to Green and Van Buskirk, neither Hopkins, Green, Van Buskirk or anyone else at Bay Pines undertook to investigate the matter although such an investigation was required by VA and Bay Pines rules and regulations.

C.     By way of further example, Oakes reported to another Assistant Director at Bay Pines, Brown, that the Chief of the Police Service, Shogren, was referring to him in a racially offensive manner and that Shogren was treating him differently since he (Oakes) objected to it.   In addition to laughing at Oakes' complaint, Brown, on information and belief, did not investigate and did not have the matter investigated although she said it was serious and would be looked into.

Such omissions and failure to investigate reflect a continuing disregard of the laws and rules concerning retaliation, serve to intimidate, cause fear that retaliation will not be addressed and will be tolerated at Bay Pines, and maintain the culture of retaliation and a hostile retaliatory work environment.

13.     In July, 2009, following a jury trial in the U.S. District Court for the Middle District of Florida (*Fiedler, et. al. v. Eric Shinseki, Secretary, Department of Veterans Affairs*; case number 8:07-cv-1524), a jury found that Bay Pines had retaliated against three doctors and an administrative officer for EEO activity and awarded damages to the plaintiffs. The complaint alleged, and the case was presented and argued as involving a systemic scheme at Bay Pines perpetrated by Hopkins, Van Buskirk and Lin to retaliate against employees who engaged in EEO activity in order to punish those employees and to deter others from engaging in EEO

6

activity. On November 23, 2009 the federal court in that case entered an order declaring that "there is no showing permitting a conclusion that the discriminatory conduct will not recur or that the circumstances have changed such that the effects of the retaliatory hostile work environment [at Bay Pines] have been eliminated" and that "[i]ndeed, it appears that no changes have been made at all at Bay Pines VA in response to the verdict in this case." The court's order also granted injunctive and equitable relief including enjoining Bay Pines from "continuing or maintaining any policy, custom, usage or practice of retaliation, retaliatory harassment, or retaliatory hostile work environment" at Bay Pines and ordered "remedial instruction on work place discrimination, with particular focus on retaliation and retaliatory harassment in the work place, and hostile work environment for, *inter alia*, Hopkins, Van Buskirk and Lin.

14.     Despite the foregoing verdict and November 23, 2009 federal court order, Bay Pines engaged in the following conduct and omissions:

A.     VHA rules, including Directive 2009-057, require the VA to take corrective action and appropriate disciplinary action immediately where there has been a finding of retaliation or reprisal. Despite the finding of retaliation or reprisal in a federal court, no corrective action or disciplinary action against Hopkins, Van Buskirk or Lin has been taken.

B.     At a Director's General Staff meeting at Bay Pines on January 7, 2010, the Bay Pines EEO manager stated during her EEO update words to the effect that the people at the meeting should not believe everything they read in the newspapers about the aforesaid case and that Bay Pines does not tolerate retaliation or reprisal against any employee who files a discrimination complaint. The Bay Pines EEO manager then commended Hopkins for his purportedly great leadership skills and presented him with

an apparent EEO-related award.

    C.    Hopkins told a group of employees at a "Directors meeting" that the aforesaid trial and verdict should be referred to as "the event." The reference to "the event" was to the fact that the term "the event" is used in Haiti to describe the hurricane there as a way of disassociating the speaker from the horror of the hurricane's destruction. Hopkins' mocking or joking use of the term to describe the trial and verdict was an attempt, *inter alia*, to trivialize and make light of the verdict and claims of retaliation at Bay Pines.

    Such conduct and omissions following the verdict and order in a federal court reflect a continuing disregard of the laws and rules concerning retaliation, serve to intimidate, cause fear that retaliation will not be addressed and will be tolerated at Bay Pines, and maintain and further the culture of retaliation and retaliatory hostile work environment.

    15.    Hopkins, Brown, Shogren, Barela, Morales, Lingenfelter and Kempienski have engaged in the pattern and practice of retaliation and have maintained a culture of retaliation and retaliatory hostile work environment at the Police Service. In addition to the conduct set forth below under the names of each Plaintiff, Bay Pines engaged in the following conduct in furtherance the pattern, practice and culture of retaliation and hostile retaliatory work environment at Bay Pines:

    A.    At a meeting in or about April or May, 2009, Hopkins told Police Service managers and supervisors not to worry about employee claims because he would always support managers, not employees.

    B.    In June, 2010, in the context of waiting in a witness room to testify in an EEO case filed by a Bay Pines police officer, Hopkins angrily told Shogren and one or

more assistant chiefs that he did not care how many police officers Shogren fired. This intimidating statement has been disseminated among police officers at the Police Service.

C.      Morales, who, as set forth below, made improper suggestive remarks to DiMaria about sexual release and his genitalia, stated that he heard everything; that he had people in HR and he heard everything; and that he had people in EEO and he heard everything; and he held up a folder marked "conversations." DiMaria understood Morales to be threatening that if she complained to anyone, including EEO, he would hear about it and retaliate.

D.      Following DiMaria's filing of an EEO complaint by DiMaria concerning Morales' inappropriate sexually suggestive statements to her, Morales told another police officer with respect to DiMaria that he was going to defend himself and knew how to defend himself. In the context of the conversation and manner in which he made the statement, the police officer understood Morales' remark to be an expression that he knew the "tricks of the trade" or how to maneuver to handle DiMaria's EEO complaint.

E.      Barela told one of the plaintiffs here, Corcoran, that supervisors will have to turn a blind eye to threatening behavior and quit complaining to Washington.

F.      Shogren boasted to Police Service employees, including Corcoran and Slam, that he fires employees and he liked to fire employees.

G.      Barela told police officers that Shogren likes to fire employees.

H.      After testifying in an investigation that included allegations of discrimination and retaliation, various police officers received notices of removal or other discipline from Shogren dated February 24, 2009, as more fully set forth below. Shogren and Barela then let officers know that another round of removals was forthcoming.

I.      In settlement of an EEO claim that Corcoran had filed, Corcoran was given a preference for promotion to a lieutenant's position if such a position should become available within a two-year period. In order to thwart the terms of that EEO settlement, Shogren, Morales and Barela were overheard planning to delay opening a lieutenant's position so Corcoran would lose his preference given to him under the settlement of his EEO complaint.

J.      Shogren told a police officer in the context of firing him that he had told him not to get involved with those people and their EEO complaints.

K.      A police officer overheard Shogren and Morales plan to terminate two probationary police officers because they had made complaints to the union during their probationary period and were therefore likely to make complaints after they became permanent.

In addition to constituting direct evidence of retaliation, the foregoing comments by administrators and by Police Service managers are themselves intimidating, cause fear of retaliation, create a hostile retaliatory work environment, and maintain the culture of retaliation and retaliatory hostile work environment.

16.     At the relevant times, Hopkins, Brown, Shogren, Morales, Barela, Lingenfelter and Kempienski were aware of relevant EEO activity by the Plaintiffs when they took the adverse actions against the Plaintiffs described herein.

17.     Each Plaintiff learned of various adverse and retaliatory actions taken against other Plaintiffs and other police officers by Hopkins, Brown, Shogren, Morales, Barela, Lingenfelter, and Kempienski, which increased the intimidation, fear of retaliation and hostile retaliatory work environment.

### B.     Darin Oakes

18.     Oakes is a Police Officer (GS-6) at Bay Pines. He began his employment as a police officer with Bay Pines in August, 2000. He became a fraud investigator for the Department of Public Service in 2001 and returned to his duties as a police officer at Bay Pines in approximately October, 2003. Oakes made an informal EEO complaint with ORM on or about September 30, 2008. The Bay Pines EEO manager was faxed a copy of the informal EEO complaint on October 2, 2008. Oakes filed a formal EEO complaint (Case No. 2001-0516-2009100003) on January 7, 2009.

19.     Oakes is a Native American. Prior to his service at Bay Pines, Oakes was a police officer with the Mohawk Tribal Police in New York. Referring to him as a "cowboy" is racially offensive to him and other Native Americans.

20.     In or about March or April, 2008, Shogren, shortly after he started at Bay Pines, referred to Oakes as a "cowboy." At the time Oakes did not comment on it. However, shortly thereafter, Oakes heard Shogren use the term again in front of Corcoran. At that time, Oakes told Shogren that the term "cowboy" was very derogatory to a Native American, that he did not like it, that he did not want to hear it, and that he (Shogren) could call him Darin or Officer Oakes. Following this conversation and in reference to it, Shogren angrily said to another officer words to the effect, "who does he [Oakes] think he is, I'm the Chief of Police." Shogren has made a false pretextual denial that Oakes complained to him regarding the term "cowboy" and has falsely stated that he quit using the term after he found out that Oakes was complaining about his use of the term.

21.     In or about March, 2008, Atkinson advised Shogren that calling Oakes a "cowboy" was offensive to Oakes as a Native American and he should not do it.

22.    In or about the summer or fall, 2008, Corcoran advised Shogren that calling Oakes a "cowboy" was offensive to Oakes as a Native American.

23.    Although Shogren did not use the term "cowboy" in front of Oakes again after Oakes complained to Shogren, Shogren did thereafter use the term out of his presence in reference to Oakes. Shogrens' use of the term "cowboy" out of Oakes' presence was reported to Oakes by other police officers.

24.    Since Oakes asked Shogren not to call him "cowboy," Shogren has treated Oakes differently. For example, Oakes did not get certain new equipment when others did. The reason given for this was that Oakes was purportedly too cavalier because he answered an e-mail concerning his size for the equipment too close to the deadline. This was pretextual since Oakes did respond within the deadline. When the second round of equipment came, Oakes still did not receive anything. Shogren's excuse that they were out of money was pretextual since others received this and other equipment, including Blackberries.

25.    On June 29, 2008, Oakes was the acting supervisor and allowed DiMaria to leave work a little less than an hour early since she was finishing a 16 hour shift and had two small children at home. At the time, Oakes understood his action to be consistent with the existing practice and the training of acting supervisors. Also on that date, Oakes did his physical training during approximately the last hour of his shift by kayaking at Bay Pines, rather than go to the Bay Pines gym, which was also consistent with the existing practice. On information and belief, it was reported to Shogren by Lingenfelter, who, it appears, was intent on developing adverse information against Oakes so Shogren could discipline Oakes, that Oakes and DiMaria had left work early.

26.    On our about July 1, 2008, Shogren, while meeting with Lingenfelter and

Kempienski, directed Atkinson, who was Oakes' supervisor, to investigate DiMaria and Oakes for purportedly leaving early on June 29, 2008. Atkinson pointed out that he would also need to take a statement from Lingenfelter concerning Lingenfelter's possible misconduct in the matter. Atkinson then went to Oakes to obtain his statement. Oakes explained to Atkinson that he understood and had been trained that he was allowed to let DiMaria leave early for excused absence. Upon checking, it was determined that this training was incorrect. Atkinson gave Oakes a verbal admonishment which was consistent, if any discipline at all was appropriate, with the range of actions for such purported conduct. Oakes also explained to Atkinson that he had not left early himself, but had done his physical training by kayaking on water at Bay Pines, which was completely proper. Oakes prepared a statement about what had happened on June 29, 2008, which Atkinson took to Shogren.

27.     When Shogren read Oakes' statement, he said the statement was "bullshit" and words to the effect that "he has gotten away with this" and crumbled up the statement. He then yelled at Oakes and told him to rewrite the statement in a way that would have been inaccurate, which Oakes declined to do.   At the time, Shogren improperly failed to give Oakes his Weingarten rights or to provide union representation.

28.     Although Oakes had already been verbally disciplined by Atkinson and Shogren, Shogren improperly directed Lingenfelter to investigate the matter, rather than Atkinson, in order to give Oakes a more harsh punishment and to avoid any negative investigation by an uninvolved supervisor (i.e. Atkinson) of Lingenfelter's improper conduct in the matter.

29.     When Atkinson inquired why Lingenfelter was now doing the investigation, Barela told him that Shogren did not trust him. Atkinson then asked Shogren about his lack of trust, and Shogren told Atkinson that he (Atkinson) was not loyal to Shogren, that he (Atkinson)

was more loyal to the officers he supervised, that he (Shogren) did not trust Atkinson and that he (Shogren) may have to move Atkinson to a different shift.   It was Atkinson's impression that Shogren was criticizing him for his opposition to Shogren using the term "cowboy" relative to Oakes and for not being harder on Oakes concerning the events on June 29, 2008.

30.   Because Oakes believed Shogren was incorrect about the time he let DiMaria leave early, on or about July 20, 2008, Oakes asked a dispatcher to use the cameras to determine the time that DiMaria actually left. He determined that the timing on the cameras was in error and that it appeared that DiMaria had not left as early as Shogren had claimed. At the time, Kempienski was in charge of the dispatchers and wanted to know what Oakes was doing with respect to the cameras. Oakes informed Kempienski that he was determining whether or not Shogren's assertion that DiMaria had left an hour early was correct. Oakes also complained to Kempienski about Shogren's treatment of him concerning the incident. Kempienski then started yelling at Oakes and told him to "blow it out your fucking peace pipe." Kempienski has made a false pretextual denial that he made this comment.

31.   Oakes complained to Corcoran, as well as Barela, about Kempienski's peace pipe remark. Corcoran also complained to Barela about Kempienski's remark.   In violation of VA rules Shogren talked to Kempienski about the incident, but not Oakes.   On information and belief, Kempienski was not disciplined for the remark.   Kempienski has not been involved in EEO activity.

32.   Oakes complained to Shogren's supervisor, Brown, that Shogren referred to him as a cowboy and that the term "cowboy" is very derogatory to a Native American.   Brown laughed at him and asserted that the comment was not offensive.   Oakes also informed Brown that Shogren was treating him differently since Oakes objected to Shogren for calling him a

"cowboy." Brown said that was a serious accusation and that she would look into it and get back to Oakes. Brown did not get back to Oakes, and, on information and belief, Brown did not look into the matter. Brown also became aware of Kempienski's July 20, 2008 peace pipe remark, but undertook no investigation.

33.     After Brown did not get back to Oakes, Oakes complained to Green about Shogren's offensive racial name calling and Brown's comment that it was not offensive. Oakes also told Brown that Corcoran and Atkinson were witnesses. Green said she would look into it. Following this meeting, Green spoke to Shogren, Brown, Atkinson, and Corcoran. Thereafter, Shogren complained that Oakes had gone to his boss and angrily said words to the effect, "who does he think he is going to my boss." Some time later, Oakes' witnesses, Atkinson and Corcoran, were both reassigned to less favorable positions.

34.     On or about August 12, 2008, Barela gave Oakes a Proposed Reprimand dated August 8, 2008 for releasing DiMaria from duty early without authorization and leaving the worksite to engage in physical training (i.e. kayaking) on June 29, 2008.  In fact, Oakes permitted DiMaria to leave early pursuant to the existing practice and custom and had already been verbally reprimanded by Atkinson and Shogren.  Further, Oakes was properly engaging in his physical training by kayaking, which he did for his upper body and lower back, and the kayaking was not done away from the worksite but on water which was part of Bay Pines.

35.     On or about September 16, 2008, Shogren improperly sustained the August 8 proposed reprimand and gave Oakes a written reprimand for releasing DiMaria from duty without authorization and leaving the worksite without authorization concerning the events on June 29, 2008.

36.     On or about April 27, 2009, Shogren refused to remove the September 16, 2008

letter of reprimand although such letters are typically removed after six months.

37.     On January 23, 2009, Oakes was unjustifiably physically assaulted by Kempienski.   As a result Oakes sustained a permanent injury to his neck resulting in approximately 45 days of loss work.

38.     A police report concerning Kempienski's assault and battery on Oakes was not completed in a timely fashion and, despite Oakes' request, the incident was also not presented to the State Attorney's Office for possible prosecution, where a prosecution was not unlikely. Rather, the matter was presented to the U.S. Attorney's Office where a prosecution for a simple battery would almost certainly be and was declined.

39.     During the investigation of Kempienski's assault on Oakes and beginning on January 26, 2009, Oakes' police credentials were revoked at Shogren's recommendation, Oakes' firearm was secured and Oakes was reassigned by Shogren to the telephone operator's suite where he was required to work with Kempienski in the operator's suite until the investigation into the assault on him by Kempienski was completed.  Shogren has made a pretextual denial that he required the revocation of Oakes' credentials or reassignment to the operator's shift. Oakes was told that he could take annual leave which he was told was consistent with past similar incidents which was also not true.

40.     Sergeant McGinnis, a Bay Pines police officer, was subject to a threat of violence by another Bay Pines police officer.  He was not required to work alongside his alleged offender, but was allowed to go home on paid leave until the investigation was completed.  McGinnis is not a Native American.

### C.     Walter Slam

41.     Slam is a Police Officer, Supervisory Sergeant (GS-7), at Bay Pines. His date of

birth is October 6, 1949. He began his employment at Bay Pines on July 28, 1991. Slam made an informal EEO complaint with ORM on or about January 27, 2009. Slam filed a formal EEO complaint on or about April 13, 2009 (Case No. 2001-0516-2009101468), which was amended or our about July 23, 2009. Slam filed another informal claim with ORM on or about October 15, 2009, and filed another formal EEO complaint on or about January 19, 2010 (Case No. 2001-0516-2010100192). Slam also filed an EEO complaint in 2007 or 2008 in which the responding management officials were Barela and Lingenfelter.

42.     In August, 2008, Slam was a witness in an investigation of Kempienski, which involved, *inter alia*, allegations against Kempienski of hostile work place environment, sexual harassment and racial discrimination.

43.     In addition to combat service in Vietnam, Slam served in combat in Afghanistan and Iraq after he was employed as a police officer at Bay Pines. Slam was awarded a Bronze star for his action in Iraq. In Iraq, Slam was injured in combat and suffered a traumatic brain injury ("TBI").

44.     After Slam returned to his duties as a police officer at Bay Pines following his tour of duty in Iraq, Barela was frequently asked him when he was retiring.

45.     On November 3, 2008, Lingenfelter told Slam that he could not work weekends, which he had been doing and had a preference for doing. Lingenfelter told him there was no reason for the change.

46.     As a result of his combat injuries, Slam was receiving medical care at the Bay Pines TBI clinic which was only available on Tuesdays. In addition, he was receiving medical treatment at Morton Plant Hospital for melanoma. Slam was entitled to and did properly take medical leave for his medical treatment.

47.     Although the TBI clinic where Slam received treatment for his combat related TBI injury was only open on Tuesdays, on or about November 10, 2008, Lingenfelter, at Shogren's direction, improperly verbally counseled Slam that he was abusing sick leave and had shown a "pattern" of sick leave because the sick leave was always on Tuesdays.  After Slam explained that he was receiving treatment on Tuesdays for, *inter alia*, a combat-related TBI, Lingenfelter said he would look into it and get back to Slam after he discussed it with Shogren. However, when Slam asked him at a later date about the verbal counseling he had received for abusing sick leave, Lingenfelter did not respond.

48.     On December 15 and 16, 2008, Shogren arranged for an instructor to come to Bay Pines for the purpose of training officers in the new VAPS (VA Police Information System) computerized report writing program.  The new computerized report writing system involved official police reports and training was necessary because it has an intricate and complicated system.

49.     On December 16, 2008, Slam, as well as Corcoran and Atkinson, were not afforded the opportunity to attend VAPS training on the new computerized report writing program. This training was important to shift supervisors since they prepare police reports, train patrolmen and do corrections in the reports.   Shogren had authorized Lingenfelter (DOB September 14, 1959), Sergeant Williams (DOB April 17, 1959), Sergeant Kempienski (DOB February 7, 1953) and Sergeant Convery (DOB February 27, 1961) to attend the training, all of whom were younger than Slam.  Although Corcoran asked, Lingenfelter gave no explanation why Slam, Corcoran and Atkinson had been excluded from VAPS training.

50.     On or about December, 2008, Shogren and Barela told Slam not to schedule himself for weekends. Shogren gave a false pretextual reason for this action.

51.     Prior to January, 2009, Slam was the supervisor on the B-Watch (2 p.m. to midnight) for four days a week, including weekends. This was his preferred shift and, as a senior supervisor, he was always able to pick the shift he worked.

52.     In an e-mail dated September 20, 2007 concerning Supervisory Seniority Status and Bidding of Shifts in Police Service, Barela stated: "Pursuant to historical practice and after consultation with Regional Counsel, the following protocol concerning seniority and future shift bidding will be in effect for **supervisory** police officers within the VA Police Service. The seniority of a **supervisory** police officer is based on the date of promotion to Sergeant. This is an established seniority practice among other services with a lengthy historical application at this facility. In March of 2008, **supervisory** police officers with the rank of Sergeant will be given the opportunity to bid for shifts with the date of their supervisory promotion being the determining factor for shift assignment."

53.     In an e-mail dated January 17, 2008, Lingenfelter stated, "Pursuant to withdrawal of EEO settlement by Sergeant Corcoran and consultation with Human Resources/Labor Relations & EEO; supervisors are to bid on their preferred shift. Please send a separate e-mail from this message to Lingenfelter no later than 1630 hours January 17, 2008".

54.     Contrary to established policy and custom, effective January 15, 2009, Shogren and Lingenfelter removed Slam from B-Watch and took him off the weekend tour, both of which he preferred. Although Slam asked Lingenfelter for an explanation, Lingenfelter did not give him one. Other officers, including Kempienski, who was not even a supervisory sergeant, were allowed to either stay on their present shift or choose a shift, but Slam was not.

55.     Contrary to VA rules and policy, Slam was not given a meaningful opportunity to discuss changes in his hours and duties with Shogren or have his views and personal problems

arising in connection with the changes considered. Further, he was not given appropriate notice of the changes in hours and duties.

56.     Kempienski left part of a transcript of his deposition in a civil case on a photocopy machine at the Police Service building. The deposition transcript was not confidential and included Kempienski's testimony at a deposition in a public civil case. The transcript appeared to indicate wrongdoing by Kempienski. The partial transcript was initially found by Oakes who turned it over to Barela. Barela discussed it with Oakes, read it and returned it to the photocopy machine. After Barela put the partial transcript back on the photocopy machine, it was found by Officer Ronald Testa ("Testa") and was read and discussed by various officers.

57.     Following the investigation of Kempienski and testimony of witnesses in August, 2008, Kempienski was found to have engaged in harassment and intimidation of the communication staff, creating a hostile work environment, inappropriate access of the NCIC (D.A.V.I.D.) system, falsifying and or asking subordinates to falsify unofficial worksheets and violating established policy by failing to tell the truth. On information and belief, Kempienski was never disciplined as a result of this investigation. During the investigation various officers testified that Testa had found Kempienski's partial deposition from a civil case and that some officers had read it and discussed it. Although the investigation concerned and found misconduct by Kempienski, on or about February 24, 2009, Shogren proposed discipline for several police officers who had testified at the investigation against Kempienski. The proposed discipline was purportedly based on the police officer's involvement with the Kempienski deposition. Shogren even proposed removal of Atkinson and Corcoran and then boasted about their proposed removal. Further, Shogren and Morales spread the word that additional removals were forthcoming.

58.    After Slam was a witness in the August, 2008 investigation of Kempienski, Shogren issued what Slam understood was a Proposed Removal letter to Slam dated February 24, 2009, for discussing the Kempienski deposition with Testa and failing to safeguard allegedly "confidential information" (i.e. the deposition), although the deposition was clearly not confidential. There was nothing improper about Slam's conduct; and even if Slam's conduct had somehow been improper, the proposed penalty was excessive and disproportionate. Although Barela had engaged in more substantial conduct concerning the deposition, no discipline was proposed for him. Prior to the February 24, 2009 letter to Slam, Shogren conducted no appropriate investigation.

59.    Attached to the February 24, 2009 letter to Slam was a letter from Brown barring him from Bay Pines until further notice and stating that if he came to Bay Pines, he would be subject to arrest and incarceration. The letter advised Slam, a veteran with a combat-related TBI injury, that if he needed medical treatment at Bay Pines, he had to contact Shogren for permission, report to Shogren before and after treatment and may be subject to a police escort to the location of the medical treatment. Slam was also suspended for approximately 50 days while Slam's proposed discipline was under consideration and contested by Slam. On information and belief, no such suspension or letter barring him from Bay Pines was given to Kempienski.

60.    Ron Plemmons ("Plemmons"), who worked in Bay Pines' Human Resources Department, was the HR contact person with respect to the proposed discipline of Slam. In this capacity Plemmons met with and discussed the matter with Hopkins. On approximately four occasions after Slam had met with Hopkins and protested the proposed discipline, Plemmons directed and attempted to coerce Slam to sign different variations of some type of apparent "last chance" agreement, which Slam declined to read or sign. On each occasion that Plemmons

presented him with a proposed agreement, Slam asked for a copy to take with him so he could study it and obtain advice about it. Plemmons refused to give him a copy and stated that once he left the office, the proposed agreement did not exist.

61.     On the last of the foregoing occasions, on or about March 31, 2009, Bonnie Wax, the head of HR, advised Slam that Hopkins was disappointed in him for purportedly refusing to settle the matter on terms that had been discussed with Hopkins, although Plemmons had tired to settle the case on terms that were different than had been discussed with Hopkins. Plemmons then presented Slam with another proposed agreement which Slam also declined to sign. Plemmons then informed Slam that he was being relieved of his duties as a sergeant at Hopkins' direction and gave Slam a March 31, 2009 demotion letter signed by Hopkins which demoted Slam from Supervisory Police Officer (GS-7) to Police Officer (GS-6) for completely invalid and contrived reasons.

62.     On April 14, 2009, the February 24, 2009 letter and the March 31, 2009 Demotion letter were rescinded because they were clearly invalid and contrived, and Slam resumed his position as a sergeant.

63.     On May 21, 2009, Slam and Officer William Hutson ("Hutson") responded to a Crises Intervention ("CIT") call, but initially declined to intervene because no police intervention was warranted, the nursing staff and CIT team had the patient under control and the CIT leader and Nursing Supervisor did not indicate she wanted the police to intervene.

64.     A nurse complained about the initial non-intervention by the police. However, the Nursing Supervisor who was in charge believed that there was no wrongdoing by Slam or Hutson and that there was merely a misunderstanding of the VA policy between the police and the nursing staff and that the nursing staff was in need of further education and training on this

issue. Nonetheless, on July 6, 2009, Morales gave Slam a written counseling asserting he failed to perform his job on May 21, 2009 by purportedly failing to make on-the-spot corrections to Hutson for allegedly inappropriate comments during the CIT call and purportedly failing to provide assistance when asked by a nurse.

65.    On or about July 23, 2009, Slam was ordered by Morales to issue a counseling statement to Hutson concerning the May 21, 2009 CIT call.   Slam did issue a counseling statement to Hutson.

66.    On or about August 10, 2009, Slam was given a Proposed Reprimand and on September 3, 2009, the Proposed Reprimand was sustained by Shogren and Slam was given a reprimand by Shogren for failure to follow instructions and lack of candor because he allegedly had not issued a written counseling to Officer Hutson as instructed, even though he had done as requested and had been candid.

67.    On August 27, 2009, Morales contacted Slam and advised him that DiMaria was not able to work A-watch, 6:00 a.m. to 4 p.m., on Sunday, September 6, 2009 and then told him to have someone else from the watch cover that shift.   Slam could not have someone switch because it would violate the union contract by not providing 14 days notice.   He told Morales that he would change his own schedule and work on Sunday; otherwise, they would have to pay an officer for overtime.   Although it would save money if Slam worked that Sunday, Morales still refused to allow Slam to schedule himself on a weekend.

68.    In violation of Police Service customs and policy and contrary to Slam's preference, on or about September 17, 2009, Slam's permanent shift assignment was changed, and he was assigned to the Regional Office on a shift on Tuesday through Friday, 7:00 a.m. to 5:00 p.m.   This was a humiliating loss of job responsibility and effectively a demotion that did

not involve real police work, but basically involved duties of a security or door guard.

69.     On or about March 24, 2010, Slam was deprived by Lingenfelter of the opportunity to work at the March 24, 2010 Bay Pines Car Show. The officers selected to work the show were to be selected on the basis of seniority and Slam was not selected although he had more seniority than those selected. Slam was older than those who worked the show, including Mario Affinito, Gregory Braun, Arturo Ortiz and Lingenfelter. Lingenfelter gave a false and pretextual reason for not selecting Slam to work the show.

### D.     Jason J. Atkinson

70.     Atkinson was a Police Officer, Supervisory Sergeant (GS-7), at Bay Pines. He began his employment at Bay Pines in 1997 and resigned his position effective September 26, 2009. Atkinson's immediate supervisor was Lingenfelter. Atkinson made an informal EEO complaint with ORM on or about October 7, 2008, and filed a formal EEO complaint on or about December 4, 2008 (Case No. 510-200900290) which was amended on February 25, 2009 and May 12, 2009.     Atkinson made another informal EEO complaint with ORM on or about September 28, 2009, and filed another formal EEO complaint on or about November 23, 2009 (Case No. 2001-0516-2009104904).

71.     Atkinson was a witness in at least three EEO complaints, including the complaint by Oakes against Shogren that Shogren engaged in racial name calling as well as an EEO complaint by Corcoran. In or about March, 2008, Atkinson objected to and told Shogren that he should not refer to Oakes as a "cowboy" because Oakes was a Native American and the term was offensive to him. In August, 2008, Atkinson was a witness in the investigation of Kempienski which involved allegations of hostile work place environment, sexual harassment and racial discrimination. Atkinson was also a witness to and opposed punishing Gustin with

24

respect to an incomplete police report when other similarly situated officers were not punished.

72.    In or about July, 2008, Shogren chastised Atkinson for not being loyal to him and stated that he does not trust him now and indicated he may have to move him to a different shift. Under the circumstances and context of this conversation, Atkinson understood these comments to be a reference to, *inter alia*, his objection to Shogren's referring to Oakes as a "cowboy" and his unwillingness to discipline or counsel Oakes more than was reasonable.

73.    On or about October 1, 2008, Shogren advised Atkinson that his shift would not be changed. However, on or about October 3, 2008, contrary to established policy, custom, and Atkinson's preference, Shogren told Atkinson that his hours were changed effective October 5, 2008, from 10-hour work days to 8-hour work days. Shogren refused to give Atkinson any explanation for the change. Shogren inaccurately told him that he was not required to give him any notice. Other officers, including Kempienski, were allowed to either stay on their present shift or choose a shift, but Atkinson was not.

74.    After advising Atkinson on or about October 1, 2008, that his tour of duty not be changed, on October 3, 2008, Shogren told Atkinson, contrary to Atkinson's preference, that he was reassigned effective October 5, 2008, from the A-Watch to the VA Regional Office Supervisory Police Officer. This was a humiliating loss of job responsibility and effectively a demotion that did not involve real police work, but basically involved duties of a security or door guard. Prior to that, Atkinson worked supervising on the A-Watch patrol and supervised as many as seven police officers. After his reassignment, he only supervised three people and worked in a building.

75.    Contrary to VA rules and policy, Atkinson was not given a meaningful opportunity to discuss changes in his hours and duties with Shogren or have his views and

personal problems arising in connection with the changes considered.  Further, he was not given appropriate notice of the changes in hours and duties.

76.    On November 18, 2008, Atkinson only received a fully successful rating on his performance appraisal.  For the past couple years before Shogren arrived, Atkinson received the rating of excellent on his performance appraisals.

77.    By letter dated November 20, 2008, Atkinson was relived of his duties as alternate armorer for the Police Service.  Atkinson had been the alternate armorer since 2004 and Shogren had no legitimate reason to remove him from the armorer position.  By comparison, the primary armorer wanted to be relieved of his duties, but was not relived of his duties.

78.    In or about December, 2008, Atkinson was excluded by Shogren from the VAPS report writing training.

79.    After Atkinson was a witness in the August, 2008 investigation of Kempienski, Shogren issued a Proposed Removal letter to Atkinson dated February 24, 2009, for discussing the Kempienski deposition with Testa and failing to safeguard "confidential information" (i.e. the deposition) and lack of candor.  The deposition was clearly not confidential, Atkinson was candid, and there was nothing improper about Atkinson's conduct.  Even if Atkinson's conduct had somehow been improper, the proposed penalty was excessive and disproportionate. Although Barela had engaged in the same or similar conduct, no discipline was proposed for him.  Further, no such discipline was proposed for Kempienski, who was the subject of the investigation out of which the disciplinary action allegedly arose and who was found to have engaged in harassment and intimidation of the communication staff, creating a hostile work environment, inappropriate access of the NCIC (D.A.V.I.D.) system, falsifying and or asking subordinates to falsify unofficial worksheets and violating established policy by failing to tell the

truth.  Prior to issuing the Proposed Removal letter, Shogren conducted no investigation. Atkinson incurred legal fees and costs in defending himself with respect to the Proposed Removal.

80.    Attached to the letter of proposed removal to Atkinson was a letter from Brown barring him from Bay Pines until further notice and stating that if he came to Bay Pines, he would be subject to arrest and incarceration.   The letter advised Atkinson, a disabled marine veteran, that if he needed medical treatment at Bay Pines, he had to contact Shogren for permission, report to Shogren before and after treatment and may be subject to police escort to the location of the medical treatment.  Atkinson was also suspended for approximately 50 days while the proposed removal was under consideration and contested by Atkinson.

81.    On April 14, 2009, the Proposed Removal Letter was rescinded because it was clearly invalid and contrived, and Atkinson resumed his supervisory responsibilities at the Regional Office.

82.    Upon Atkinson's return to work in or about April, 2009, Shogren again removed Atkinson from his compressed work schedule.

83.    Upon Atkinson's return to work in April, 2010, Shogren was blatantly rude, hostile and disagreeable to Atkinson.

84.    Prior to April, 2009, a new Lieutenant's position was to be announced.  Shogren, Morales and Barela thought that Corcoran and Atkinson would apply for the position.   In addition to delaying the announcement of the position so that Corcoran would be deprived of a preference in obtaining this position, Shogren, Morales and Barela schemed to invent questions to be used in the interview process which they specifically thought would cause Atkinson to do poorly during the interview process in order to undermine his chances of becoming a Lieutenant.

27

85.    On or about May 7, 2009, Shogren caused Atkinson to be relieved of his duties as a Firearms Instructor which he had been since 2004.  Shogren has given a pretextual reason for this action.

86.    On or about May 7, 2009, Shogren caused Atkinson to be relieved of his duties as a Defensive Tactics Instructor which he had been since 1997.   Shogren has given a pretextual reason for this action.

87.    On or about May 7, 2009, Shogren caused Atkinson to be relieved of his duties as a PR-24 (Police Baton) Instructor which he had been since 1997.  Shogren has given a pretextual reason for this action.

88.    On September 26, 2009, Atkinson was constructively discharged and was compelled to submit his resignation from Bay Pines as a result, *inter alia*, of the foregoing conduct by Shogren and others, continuing retaliation and a retaliatory hostile environment, a constant fear of termination by Shogren and the fact that Shogren would never permit him to advance in the Police Service at Bay Pines.

### E.     Michael D. Corcoran

89.    Corcoran is a Police Officer, Supervisory Sergeant (GS-7), at Bay Pines.  His date of birth is April 25, 1951.  He began his employment at Bay Pines in September, 1992, and has been employed with the Police Service since in or about December, 1994. Corcoran made an informal EEO complaint with ORM on or about October 7, 2008.  Corcoran filed a formal EEO complaint on or about December 22, 2008 (Case No. 2001-0516-2009100091), which was amended April 23, 2009, June 25, 2009 and January 2, 2010.  Corcoran made another informal EEO complaint with ORM and filed another formal EEO complaint.

90.    Corcoran has made other EEO complaints including one in March, 2006.  In

August, 2008, Corcoran was a witness in an investigation of Kempienski which involved allegations of hostile work place environment, sexual harassment and racial discrimination. In or about the summer or fall, 2008, Corcoran was a witness to and spoke to Shogren in opposition to Shogren referring to Oakes as a "cowboy." On or about January 25, 2009, Corcoran also complained or opposed the hostile work environment resulting from Kempienski's January 23, 2009 physical assault on Oakes, to whom Kempienski had also made a derogatory racial remark. At that time Corcoran also opposed the lack of action by Shogren concerning Kempienski's conduct.

91.     As of September, 2008, Corcoran was a highly respected supervisor with the highest officer seniority at the Police Service. He worked in the patrol section and supervised other police officers. Corcoran worked the C-Watch or night shift on a compressed work schedule (i.e. 10 p.m. to 8 a.m.) four nights a week which was the shift and tour of duty he preferred. Corcoran also had a separate day job to help pay the costs of his son's college education, which Shogren knew.

92.     In late September or early October, 2008, Shogren advised Corcoran that his shift and tour of duty would not be changed. However, in or about October 3, 2008, Corcoran was told at Shogren's direction that he (Corcoran) was reassigned effective October 12, 2008 to the Police Service Communications Center as the Supervisory Police Officer. This reassignment was contrary to Corcoran's preference. Working in the Communications Center diminished Corcoran's job responsibilities and the prestige of his position. Corcoran's new assignment was essentially clerk's position. Further, Corcoran no longer supervised police officers, but supervised civilians. Such change in position was considered by Corcoran and other police officers as a humiliating demotion to a dead-end position. When Corcoran asked Shogren why

another supervisor with experience at the Communication Center was not being put there, Shogren failed to answer the question and simply stated he did not want another supervisor to go there, he wanted Corcoran to go there, and he was the chief of police and would do whatever he wanted.

93.    On or about October 3, 2008, contrary to established policy and custom, Corcoran was also told at Shogren's direction that Corcoran's hours of duty were changed effective October 12, 2008 to 7 a.m. to 3 p.m. five days a week, so that he would lose the night shift and a compressed work schedule. This reassignment was contrary to Corcoran's preference. This resulted in loss of the night shift and loss pay. Other officers, including Kempienski, were allowed to either stay on their present shift or to choose a shift, but Corcoran was not.

94.    Contrary to VA rules and policy, Corcoran was not given a meaningful opportunity to discuss changes in his hours and duties with Shogren or have his views and personal problems arising in connection with the changes considered. Further, he was not given appropriate notice of the changes in hours and duties.

95.    In or about December, 2008, Corcoran was excluded from VAPS report writing training. The officers selected to attend were all younger than Corcoran.

96.    On or about January 20, 2009, Corcoran was denied by Shogren critical required firearms training beneficial to his career and necessary to prepare for firearms qualification because Shogren told him that he was required to attend a department meeting that was not mandatory.

97.    After Corcoran was a witness in the August, 2008 investigation of Kempienski, Shogren issued a Proposed Removal letter to Corcoran dated February 24, 2009, for discussing the Kempienski deposition with Testa and failing to safeguard "confidential information" (i.e.

the deposition) and lack of candor. The deposition was clearly not confidential, Corcoran was candid and Corcoran's conduct was not improper. Even if Corcoran's conduct had somehow been improper, the proposed penalty was excessive and disproportionate. Although Barela had engaged in the same or similar conduct, no discipline was proposed for him. Further, no such discipline was proposed for Kempienski, who was the subject of the inquiry out of which the disciplinary action allegedly arose and who was found to have engaged in harassment and intimidation of the communication staff, creating a hostile work environment, inappropriate access of the NCIC (D.A.V.I.D.) system, falsifying and or asking subordinates to falsify unofficial worksheets and violating established policy by failing to tell the truth. Prior to issuing the Proposed Removal letter, Shogren conducted no investigation. Corcoran incurred legal fees and costs in defending himself with respect to the Proposed Removal.

98.    Attached to the letter of proposed removal to Corcoran was a letter from Brown barring him from Bay Pines until further notice and stating that if he came to Bay Pines, he would be subject to arrest and incarceration. Corcoran was also suspended for approximately 50 days while the proposed removal was under consideration and contested by Corcoran.

99.    On April 14, 2009, the Proposed Removal Letter was rescinded because it was clearly invalid and contrived, and Corcoran resumed his supervisory responsibilities in the Communications Center.

100.   On or about May 7, 2009, after the proposed removal was rescinded, Corcoran was returned to his prior position on C-Watch.

101.   Prior to April, 2009, the Police Service only had one Lieutenant, and Shogren, Morales and Barela wanted to add another. As a result of a prior EEO settlement involving Corcoran, Corcoran was to be given a preference until April, 2009 for a Lieutenant's position.

Shogren, Morales and Barela deliberately delayed opening a second Lieutenant's position past April, 2009 so that Corcoran would lose his preference under the prior EEO settlement for that position.

102.   When the aforesaid Lieutenant's position was opened in late April or May, 2009, Corcoran and other candidates applied for the position.  As part of the process of choosing a candidate for the position Corcoran was interviewed and scored by three other police officers, including Morales.   During the interview, each of the three officers was to score Corcoran and his score would be compared with the scores of other candidates in determining which candidate would be chosen for the position.  As he did on at least one other occasion (i.e. involving Chad DiMaria), Morales improperly delayed his scoring until he could and did determine how the other police officers scored Corcoran and then willfully and unfairly scored Corcoran substantially lower than the officers had for the purpose and with the result that Corcoran was not promoted to Lieutenant.

103.   In early June, 2009, Shogren threatened to reassign Corcoran to the Communications Center and to take him off C-Watch.  Although Morales said assignments would be done by seniority, on or about June 23 or 24, 2009, Corcoran was notified that he was being reassigned to the Communications Center.  Assistant Chief Barela advised Corcoran that he would be reassigned hours of duty because it was what Shogren wanted.  Barela admitted that there was no business reason for Shogren's decision.   In addition, Barela threatened that supervisors at Bay Pines will have to turn a blind eye to threatening behavior and quit complaining to Washington.

104.   As he was told on June 23 or 24, 2009, on or about July 8, 2009, against Corcoran's wishes, Corcoran was reassigned to the Communications Center.  At first he was on a

compressed work schedule of 6:00 a.m. to 4:00 p.m.   However, against his wishes, after a few months, Corcoran's work schedule was again changed to 8 hours a day, 7 a.m. to 3 p.m.

105.   When Corcoran was reassigned to the Communications Center effective July 8, 2008, he was replaced by a 37-year-old police officer who had just been appointed as supervisory police officer approximately two weeks prior.

106.   On or about March 30, 2010, Shogren proposed a one day suspension for Corcoran for telling DiMaria about improper statements about DiMaria by Torres.  The proposed suspension was rescinded.

107.   Corcoran has been excluded and continues to be excluded from supervisory training programs scheduled for police and security supervisors.

108.   Corcoran has been excluded and continues to be excluded from management decisions that affect him and those he supervises.  Corcoran was told that all assignments would be done by seniority, which was agreed to by Regional Counsel and Human Resources, but Shogren did not do that.  Decisions are made about Corcoran's assignments without including him in the discussions.

### F.    Matthew Gustin

109.   Gustin was a Police Officer (GS-6) at Bay Pines.  He began his employment at Bay Pines on November 14, 2004 and left Bay Pines and took a position at VA police position outside of Bay Pines on December 31, 2008.  He is currently a VA Police Sergeant at the Tampa domiciliary in Tampa, Florida. Gustin made an informal EEO complaint with ORM on or about September 16, 2008, and filed a formal EEO complaint on or about October 20, 2008 (Case No. 2001-0516-2008104639).   He also made an informal EEO complaint with ORM on or about November 13, 2008, and filed a formal EEO complaint on or about December 24, 2008 (Case

No. 2001-0516-2009100564).

110. Gustin also engaged in prior EEO activity, including activity on or about June, 2007, in which Lingenfelter was the named responding managing official. In August, 2008, Gustin was a witness in an investigation of Kempienski which involved allegations of hostile work place environment, sexual harassment and racial discrimination.

111. On September 4, 2008, Lingenfelter ordered Gustin into his office. Without giving Gustin an opportunity to contact his supervisor, Atkinson, or a union representative, Lingenfelter demanded an explanation for why certain information was not filled out on a police report. Lingenfelter talked to him in a loud, confrontational and unprofessional tone and caused Gustin to be concerned for his safety. Moreover, Lingenfelter failed to use the chain of command. Lingenfelter intimated that Gustin had purposely not completed the report. Lingenfelter repeatedly refused to provide information about the report which Gustin needed to respond to Lingenfelter's questions. Gustin was not insubordinate or otherwise disrespectful.

112. Lingenfelter had a binder of 30 or more reports that had not been completed by other officers as well. None of the other officers who failed to completely fill in the reports were disciplined. Further, no other Bay Pines officers had been approached in such a manner or received a reprimand for this type of issue. Lingenfelter himself has prepared an incident report which omitted information and was incomplete. Gustin's purportedly incomplete report should have been handled by Gustin's supervisor, Atkinson, and not Lingenfelter. Eventually, Atkinson provided the necessary information and Gustin completed the contents of the report in 15 minutes or less.

113. On or about September 12, 2008, Gustin and a union representative met with Lingenfelter to discuss Lingenfelter's allegation that Gustin had failed to fill out a report. At the

34

end of the meeting, Lingenfelter indicated that the situation was finished and it appeared that everything had been resolved.

114.   In or about September, 2008, Gustin applied for, qualified for and was referred for consideration to the position of Detective, GS-7.   He was interviewed by a panel of police officers which included Lingenfelter.

115.   Although Gustin was more qualified and experienced for the position, Elvin Ruiz was selected.   Ruiz had no prior EEO activity.   On information and belief, Lingenfelter caused Gustin not to be selected.   On or about the date on which Ruiz was selected over Gustin, October 29, 2008, Gustin received a proposed reprimand by Lingenfelter regarding the allegedly incomplete police report and the September 4, 2008 encounter between Gustin and Lingenfelter concerning it.   The pending proposed reprimand was pretextual and used pretextually by Shogren as an excuse for Gustin not having been chosen for the detective position.   During the selection process, Ruiz's badge and credentials were stolen and Ruiz himself should have been subject to pending possible discipline for losing his badge and credentials.   Further, at a different time, Shogren used a different pretextual excuse for Gustin not having been chosen for the detective position.

116.   On or about December 9, 2008, the proposed reprimand for the incident on September 4, 2008 was improperly sustained by Shogren.   When Gustin requested Shogren to rescind the charges, he refused stating that he could not rescind the charges due to Gustin's EEO activities.

117.   In or about December, 2008, Gustin applied for, but was denied Firearms and PR-24 training.   Although he was senior to Officer Andrew Beauchamp ("Beauchamp"), Beauchamp was allowed to go to firearms training and Oneil was allowed to go to PR-24 training.   Although

asked by Gustin, Shogren could not give a valid reason for why Gustin was denied training.

118.   On or about December 31, 2008, Gustin was constructively discharged and was compelled to submit his resignation from Bay Pines as a result, *inter alia*, of the foregoing conduct by Shogren and others, continuing retaliation and a retaliatory hostile environment, a constant fear of termination by Shogren and the fact that Shogren would never permit him to advance in the Police Service at Bay Pines.

### G.   Kendra DiMaria

119.   DiMaria is a female Police Officer (GS-6) at Bay Pines.   She began her employment at Bay Pines in September, 2007. DiMaria made an informal EEO complaint with ORM on or about January 13, 2010, and filed a formal EEO complaint in or about April or May, 2010 (Case No. 2001-0516-2010101333).

120.   DiMaria engaged in prior EEO activity in that she was a witness concerning issues raised by Oakes and Gustin.   In addition she opposed sexual advances and harassment by Morales.

121.   At all relevant times, DiMaria was married to Chad DiMaria, another Bay Pines Police Officer.

122.   In or about late July or early August, 2009, Morales radioed DiMaria to pick him up so he could purportedly ride back-up in her vehicle.  This was highly unusual since Morales was an assistant chief and typically did not ride back up in a vehicle.  DiMaria asked Morales where they should go on patrol.  Morales responded with words to the effect, "where you go I go."  DiMaria responded with words to the effect, "O.K., I just did not know if you wanted to come."  Morales replied, "Oh, I want to come!"  The way in which Morales made the statement, including verbally emphasizing the word "come" and laughing at the sexual innuendo, was

clearly intended as a reference to sexual release. DiMaria objected and stated that was not what she meant. Morales responded with words to the effect, "then why are you blushing?" which further showed and emphasized the inappropriate reference.

123. Later, in conversation, Morales said something to DiMaria, which she could not understand. DiMaria told Morales that his accent was "thicker" than Officer Ruiz's. Morales laughingly replied with words to the effect, "mine is thicker than Ruiz's!" The way in which Morales made the statement, including verbally emphasizing the word "thicker" and laughing at the sexual innuendo, was clearly intended as a reference to his genitalia. DiMaria objected and stated that that was not what she meant. Morales responded with the comment that she was blushing again, which further showed and emphasized the inappropriate reference.

124. Morales was scheduled to attend a week-long retraining course at the VA Police Academy in Little Rock, Arkansas, beginning on or about August 17, 2009. A two-week firearms instructor training course at the Academy was also beginning on that same date. On or about August 7, 2009, Morales suggested that DiMaria attend the firearms instructor training course. DiMaria indicated that she would attend the training and that she would drive to the Academy in Little Rock, which would necessitate an overnight stay during the drive. Morales then stated that he would ride with her. After DiMaria discussed with her husband Morales' desire to ride with her to Little Rock, DiMaria advised Morales that she would not to attend the training in Little Rock. Part of the reason for DiMaria's decision not to attend the firearms training was a fear of further inappropriate conduct by Morales.

125. After DiMaria advised Morales that she decided not to attend the training in Little Rock, Morales became aggravated and treated her differently than before. For example, on or about August 26, 2009, DiMaria, who was on A-Watch, discussed a rotation schedule with

37

Morales, which would have involved her rotating to C-Watch.  DiMaria explained to Morales that this would be a hardship for her since she had two small children.  Morales stated that that was not his problem and that he was not a babysitter.   Three other officers, including Beauchamp, Oakes and Testa, all male, were not being required to rotate as a result of hardship. When DiMaria asked why the three (male) officers were not required to rotate on the grounds of hardship, Morales started yelling at her in the hallway and said that all the police officers will now have to rotate and that she "got your wish."  Morales also observed that it would be her fault if the police officers' wives ended up in a wheelchair because everyone had to rotate.  He also advised the other three officers that they had to rotate because of DiMaria.  DiMaria was not disrespectful during the meeting.

126.   Over a month after the conversation between Morales and DiMaria involving the issue of rotation, Morales gave DiMaria a verbal counseling on or about October 1, 2009, for purportedly being disrespectful during the August 26, 2009 conversation.  Although required to do so, Morales would not permit DiMaria to have a union representative present.  After DiMaria complained to the union representative about the failure of Morales to permit her to have a union representative present when she was given the counseling, Morales was required to re-do the counseling on or about October 7, 2009.  At that time, he added to the verbal counseling an allegation that on October 2, 2009 she was purportedly insubordinate because she threw a pen. When DiMaria denied that she threw a pen, Morales claimed that he had a witness, Torres. However, Torres later denied that she was a witness to such an incident.

127.   On December 30, 2009, DiMaria had a private argument in the women's locker room with Torres.  However, the argument became heated and loud enough that other officers interceded which ended the argument.  Such arguments are not uncommon and are usually

resolved without investigation or discipline. However, upon learning of the argument, Morales undertook to extensively investigate the incident, including interviewing several officers and requiring officers to write reports of contact concerning the incident. During his questioning of DiMaria concerning the incident, Morales prompted DiMaria to implicate Corcoran in wrongdoing concerning the incident so that he could charge him with lack of candor. In this connection, Morales attempted to force DiMaria against her will to change her report of contact so that it reflected negatively on Corcoran.

128. As more fully set forth below, on or about December 8, 2009, Morales, in order to retaliate against DiMaria for refusing his advances and objecting to his inappropriate sexual comments, caused her husband, Chad DiMaria, not to be selected for a promotion.

129. On or about January 13, 2010, DiMaria made an informal complaint with ORM regarding harassment by Morales, including his sexual harassment.

130. Following DiMaria's EEO complaint with ORM concerning Morales, Morales spoke to a Bay Pines police officer, Detective Timothy Torain ("Torain"), on or about January 19 or 20, 2010 and told Torain that he was going to defend himself and he knew how to defend himself. Torain understood from the context of the conversation and the manner in which the remark was made that Morales knew the tricks of the trade and how to maneuver in dealing with DiMaria's EEO complaint.

131. Following DiMaria's EEO complaint with ORM concerning Morales, Morales has on several occasions followed her and attempted to listen in on her conversations.

132. In or about September, 2009, Morales overheard Torain and DiMaria talking and incorrectly thought that DiMaria was making a complaint about something, which she was not. When Torain advised Morales that DiMaria was not complaining, Morales commented that

Torain always took her side.

133.   On or about January 21, 2010, Morales solicited a report of contact from Ortiz and failed to follow the chain of command in an effort to create unfavorable information about DiMaria.

134.   In retaliation for DiMaria's EEO activity, on February 8, 2010, Barela gave Torain a letter of discussion which directed him to stop conversing with DiMaria and which inaccurately portrayed events reflected in the letter of discussion.

135.   On or about March 5, 2010, Shogren improperly proposed a one-day suspension for DiMaria based on information from Morales for conduct unbecoming a federal employee, failure to follow instructions and disrespectful conduct.   Part of the proposed suspension was because DiMaria refused to include in her statement about the December 30, 2009 argument with Torres untrue information reflecting negatively on Corcoran which Morales had directed her to put in the statement.   On or about April 27, 2010, this was reduced to a reprimand by Brown. No discipline at all should have been imposed.

136.   As more fully set forth below, Morales and Barela have attempted to prevent Torain from communicating with DiMaria.

137.   Although she wanted to, DiMaria has not applied for promotion opportunities to avoid working directly for Morales as a result of his conduct towards her.

### H.   Chad DiMaria

138.   Chad DiMaria is a Police Officer (GS-6) at Bay Pines.   He is the husband of Kendra DiMaria.   Chad DiMaria began his employment at Bay Pines in August, 2008.   Chad DiMaria made an informal EEO complaint with ORM in or about April, 2010, and filed a formal EEO complaint in or about May, 2010 (Case No. 2001-0516-2010102845).

142.   In or about November, 2009, Chad DiMaria and other candidates applied for the position of sergeant.

143.   During the process of choosing a sergeant, on or about December 8 or 9, 2009, Chad DiMaria was interviewed by three officers, including Morales. During the interview, each of the three officers was to score Chad DiMaria and his score would be compared with the scores of other candidates in determining which candidate would be chosen for the position. Similar to what he had done to Corcoran, Morales improperly delayed his scoring of Chad DiMaria until he could and did determine how the other officers had scored Chad DiMaria. After he determined how the other officers had scored Chad DiMaria, Morales then willfully and unfairly scored Chad DiMaria substantially lower than the other officers had for the purpose of preventing Chad DiMaria from being promoted to Sergeant. This was done in retaliation as a result of Chad DiMaria's wife rejecting and opposing Morales' inappropriate advances and sexual comments. As a result of Morales' conduct, Chad DiMaria was not chosen for the position of sergeant.

144.   Plaintiffs have hired the undersigned law firm and agreed to pay them reasonable attorneys' fees and costs.

## COUNT I
### (Retaliation – all Plaintiffs)

145.   The Plaintiffs, Jason Atkinson, Darin Oakes, Walter Slam, Michael Corcoran, Matthew Gustin, Kendra DiMaria and Chad DiMaria sue Eric K. Shinseki as the Secretary of Veterans Affairs, for retaliation under Title VII.

146.   The Plaintiffs incorporate and reallege paragraphs 1 through 144.

147.   Each Plaintiff engaged in EEO activity which is protected under Title VII.

148.   The Defendant was aware of each of their protected or EEO activities under Title VII.

149.   The adverse employment actions and other adverse actions described above and other adverse employment actions were taken by administrators and managing and supervisory personnel within Bay Pines in retaliation for the protected or EEO activity of the Plaintiffs including those set forth above.

150.   As a direct and proximate result of the protected or EEO activity each Plaintiff has suffered the adverse employment actions and other adverse actions, including set forth above.

151.   Bay Pines has intentionally maintained these retaliatory and unlawful practices to the detriment of its employees.

152.   The Defendant at all relevant times knew or should have known of the retaliatory actions being taken against each Plaintiff.

153.   The Defendant failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

154.   The Defendant, through the supervisors of the Plaintiffs, including Hopkins, Brown, Shogren, Morales, Barela, Lingenfelter and others, including Kempienski, has engaged in, directed, and/or ratified retaliatory conduct and frustrated the Plaintiffs' efforts to obtain relief under Title VII.

155.   The Defendant, through acceptance of such conduct, has fostered an attitude among administrators, managers and supervisors in Bay Pines that retaliation against employees in order to discourage protected EEO activity is an acceptable employment practice by administrators, managers and supervisors at Bay Pines.

156.   Because of the willful actions of the Defendant and its administrators, managers and supervisors, and as a proximate cause thereof, each Plaintiff has been and continues to be

denied their right to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

157.    As a result of the foregoing, each Plaintiff has been damaged. Such damages include, but are not limited to discipline or proposed discipline including removal, suspension, demotion, reprimand and counseling; constructive discharge; loss of pay; loss of benefits; loss of training; loss of supervisory positions; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputations; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering. The Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

158.    The Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, the Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT II
### (Retaliatory Hostile Work Environment – all Plaintiffs

159.    The Plaintiffs, Jason Atkinson, Darin Oakes, Walter Slam, Matthew Gustin, Michael Corcoran, Kendra DiMaria and Chad DiMaria sue Eric K. Shinseki as the Secretary of Veterans Affairs, for retaliatory hostile work environment.

160.    The Plaintiffs incorporate and reallege paragraphs 1 through 158.

161.    The aforesaid actions and conduct have created an intolerable hostile work environment.

43

162.    As a result of the foregoing, each Plaintiff has been damaged.  Such damages include, but are not limited to constructive discharge, payment of attorneys' fees and legal costs, loss of an amicable work environment, humiliation, anxiety, degradation, embarrassment, and severe emotional suffering.  The Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

163.    The Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, the Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

### COUNT III
### (Injunctive Relief)

164.    The Plaintiffs, Jason Atkinson, Darin Oakes, Walter Slam, Michael Corcoran, Matthew Gustin, Kendra DiMaria and Chad DiMaria hereby sue Defendant Eric K. Shinseki, as Secretary of the Department of Veterans Affairs.

165.    Plaintiffs incorporate and reallege paragraphs 1 through 163.

166.    Unless the above practices are enjoined, the Plaintiffs will suffer irreparable harm.

167.    There is: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless an injunction issues; (3) the threatened injury to the Plaintiffs is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, is issued, will not disserve the public interest.

168.    Plaintiffs request the Court award them their attorneys' fees and costs and enter preliminary and permanent injunctions enjoining the following practices, actions and conduct:

a.      Violating Title VII or the Civil Rights Act of 1964, 42 U.S.C. §

2000e, *et seq.*, as described above including retaliation against the Plaintiffs for

protected or EEO activity and discrimination based on gender, race and age.

b.      Such other practices, actions or conduct that the court deems

appropriate and proper to enjoin.

WHEREFORE, Plaintiffs demand trial by jury of all issues so triable and such other and

further relief as the Court deems just and appropriate.

## COUNT IV
### (Race Discrimination – Oakes)

169.    The Plaintiff, Darin Oakes, sues Eric K. Shinseki as Secretary of the Department

of Veterans Affairs for racial discrimination under Title VII.

170.    Plaintiff incorporates and realleges paragraphs 1 through 163.

171.    As a direct result and proximate result of the foregoing conduct, the Plaintiff,

Oakes, has been denied equal employment opportunity for wages, promotion, and other terms

and conditions of employment by the Defendant because of race (Native American).

172.    The above discriminatory actions were taken by the supervisory personnel within

the VA in order to deprive Oakes of employment and other employment action because of his

race.

173.    The Defendant has intentionally maintained these discriminatory and unlawful

practices to the detriment of its employee.

174.    The above-referenced actions have created an intolerable hostile work

environment.

175.    The Defendant at all relevant times knew, or should have known, of the above-

referenced discrimination against the Plaintiff.

attitude among managers and supervisors at Bay Pines that gender discrimination is acceptable employment practice.

192. Because of the willful actions of the Defendant and its administrators, managers and supervisors, and as a proximate cause thereof, the Plaintiffs have been and continue to be denied their rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq,*

193. As a result of the foregoing, the Plaintiff has been damaged. Such damages include, but are not limited to discipline, loss of pay, loss of benefits, loss of training, loss of an amicable work environment, loss of career and professional opportunities, payment of attorneys' fees and legal costs, harm to professional reputation, humiliation, anxiety, degradation, embarrassment, and severe emotional suffering. The Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

194. The Plaintiff has satisfied all conditions precedent to filing of this suit or she has been prevented by the Defendant from satisfying such conditions precedent or is excused under the law from satisfying any other conditions.

WHEREFORE Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT VI
## (Age Discrimination: Corcoran and Slam)

195. The Plaintiffs, Michael Corcoran and Walter Slam, sue Eric K. Shinseki as Secretary of the Department of Veterans Affairs for age discrimination under Title VII.

196. Plaintiff incorporates and realleges paragraphs 1 through 163.

197. The Defendant has followed a course which results in disparate treatment based

on age with respect to employment actions. The Defendant's practice cannot be justified as a business necessity.

198.   As a direct result and proximate result of the aforesaid conduct, Corcoran has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of age.

199.   As a direct result and proximate result of the aforesaid conduct, Slam has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of age.

200.   All of the above discriminatory actions were taken by the supervisory personnel within the VA in order to deprive the Plaintiffs, Corcoran and Slam, of employment and other employment action because of their age.

201.   The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of its employees.

202.   The above-referenced actions have created an intolerable hostile work environment.

203.   The Defendant at all relevant times knew, or should have known, of the above-referenced discrimination against the Plaintiffs.

204.   The Defendant has failed to take necessary action to prevent or correct the complaint of discrimination and, in fact, ratified such conduct.

205.   The Defendant, through the Plaintiffs' managers and supervisors, has engaged in, directed or ratified conduct and denied and frustrated the Plaintiffs' efforts to obtain relief under Title VII.

206.   The Defendant, through acceptance of the complained of conduct, has fostered an

attitude among supervisors at Bay Pines that age discrimination is acceptable employment practice.

207.   Because of the willful actions of the Defendant and its supervisors, and as a proximate cause thereof, Corcoran and Slam have been and continue to be denied their rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

208.   As a result of the foregoing, the Plaintiffs, Corcoran and Slam, have been damaged. Those damages include, but are not limited to discipline, lost pay, loss of benefits, loss of supervisory position, payment of attorneys' fees and costs, loss of training, loss of an amicable working environment, loss of career and professional opportunities, harm to professional reputation, humiliation, anxiety, degradation, embarrassment, and severe emotional suffering. The Plaintiffs, Corcoran and Slam, will continue in the future to suffer these damages absent relief from this Court.

209.   The Plaintiffs have satisfied all conditions precedent to filing of this suit or they have been prevented by the Defendant from satisfying such conditions precedent or they are excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiffs request prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## DEMAND FOR JURY TRIAL

The Plaintiffs, Jason Atkinson, Darin Oakes, Walter Slam, Michael Corcoran, Matthew Gustin, Kendra DiMaria and Chad DiMaria, hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Joseph D. Magri
Florida Bar No.: 0811490

Ward A. Meythaler
Florida Bar No.: 0832723
Merkle Magri & Meythaler, P.A.
5415 Mariner St., Suite 103
Tampa, FL 33609
Tel. (813) 281-9000
Fax.: (813) 281-2223
Email: jmagri@merklemagri.com